Curia, per Wardlaw, J.
The prisoner was, at May Term last in Charleston, before Judge Withers, indicted for “ that he, &c. a certain house of one Thomas Corcoran, there situate, feloniously, wilfully and maliciously did set fire to, and the same house, then and there, by such firing as aforesaid, feloniously, wilfully and maliciously did burn and consume, against the peace and dignity of the same State afore-, said.” A verdict of guilty was rendered after trial, at the term aforesaid. An appeal was taken in behalf of the prisoner, and notice given to the Judge and Attorney General, that a motion for new trial would be made in this Court. A report for this Court was made by Judge Withers, and delivered to the counsel of the prisoner. The case was here docketed by the prisoner’s counsel, and at his request was marked “ appeal abandoned.” .The prisoner was placed at the bar, and it having been solemnly demanded of him why sentence of death should not be pronounced against him, he *393 first insisted that this Court has no further jurisdiction in the matter, but that he must be remanded to await the judgment of the Circuit Court, at the next term; and, secondly, he prayed the benefit of clergy. Full argument has been heard, and I am now to announce the opinion 'of the Court upon these two points:
I. Before 1768 the General Court at Charleston had original and final jurisdiction of all criminal matters, extending to life or limb. From 1768 till 1790, there were district Courts held by one or more of the Judges of the General Court, under a practice avhich was rendered, .as nearly as could be, similar to that of the Courts of Assize and Nisi Prius in England. In civil actions all writs were issued from and. made returnable to the Court of Common Pleas in Charleston, although trials were had ih the other districts ; and at Charleston the Judges sat in bank to hear motions for new trial, or m arrest of judgment, and points of law reserved, in all actions — civil and criminal. The practice, then established, was for a convict whose trial had taken place in a country district, and in whose case argument was heard before the bench, or assemblage of the Judges, at the end of the circuits, to appear at the bar of the Court in Charleston, and there, if his conviction was sustained, to receive his sentence. In 1789 the Circuit Court Act gave to each of the district Courts the same complete, original and final jurisdiction, which had before been possessed by the Court of General Sessions and Common Pleas for Charleston, saving, in the 15th section, the right of any party thinking himself aggrieved in a district Court, to move “ for a new trial or arrest of judgment, under such restrictions and in such manner as the Judges may think proper to establish by the rules and orders of Court.” This section was a recognition of the mode of trying appeals before in use, rather than the establishment of a new mode, and it was the only direct reference 'had by legislation to a tribunal for appeals, before the State Constitution of 1790. The third section of the tenth article of that Constitution required the Judges to meet “ for hearing and determining all motions which may be made for new trials and in arrest of judgments, and such points of law as may be submitted to them.” So little did this change the pre-existing practice as to appeals, that the Act of 1791, which regulated the Circuit Courts, just then gone into operation under the Act of 1789, contains not a word concerning appeals. Indeed the Constitutional Court long subsisted with very little of regulation besides what is contained in the clause of the Constitution from which it took its name, and in its own orders and practice, most of which had come to it from the tribunal to avhich it succeeded. A section of an Act of 1792 calls it the adjournment Court, and requires *394 that at least three Judges should be necessary to constitute jt. To accommodate the appellate tribunal to the changes that were made by the new system of district Courts, adopt-e¿ (Q X798, an Act of 1799 introduced some rules to be observed at the meeting of the “associate Judges at the end of the circuits,” to which rules some additions were made in But essential particulars, relating either to its organization or practice, the Constitutional Court, as it was left by the Constitution, stood until 1824, when a Court of Appeals, consisting of three Judges, was established. As is well known that Court, in 1835, gave way to a Court of Appeals composed of the ten Judges and Chancellors ; and that the next year to the present system.
At all times, and under all changes, it has been the unvarying practice of the Court which heard the motion’s for new trial, motions in arrest of judgment, and points of law, contemplated by the Constitution, to give judgment in the cases fe'ony brought before it, if judgment was, according to the result had in the Court, to be awarded. The earliest reported cases we have, which show the practice, are The State v. McCarty, Id. v. Hopkins and Id. v. Duestoe, in 1793-4; and from these it may be seen how unquestioned the practice then was. Hardly a case has since passed, where some instance of judgment of death, pronounced in the Court of Appeals, did not occur. Until 1832, even in a case of misdemeanor, the defendant who appealed was required to appear in the Court of Appeals, and itpon failure 'of his motion, to receive sentence there. This was rendered unnecessary, not unlawful, by the Act of 1832, which left unaltered, in cases of felony, the practice that in misdemeanors it made special provisions to dispense with.
Whether the power of awarding judgment, in cases of felony wherein the appeal has failed, would, in a careful division of duties between a court of original jurisdiction and one of exclusively appellate jurisdiction, be assigned to one or the other, it is here exercised at discretion by the Court of Appeals; and its exercise has been sanctioned by long practice, acquiesced in by all the public authorities, which has acquired the force of direct legislation. There is nothing in the State Constitution which prohibits the exercise by this court, of any judicial power, whether pertaining to original or appellate jurisdiction, that may have been conferred on it by law. Now to deny in general the power in question, would lead to conclusions concerning past cases, which it is shocking to contemplate. The denial of the power in this particular case, if accompanied by the admission of it in general, and rested on any sound principle, must find circumstances distinguishing this from all the cases of felony wherein appeals have been unsuccessful that have preceded it, sufficient *395 to show that what was right in them, would be wrong in this.
The prayer for benefit of clergy made here, is not such a circumstance. Without the formal prayer, the benefit of it was given by law, and would be allowed by any court an-thorized to pass sentence. A denial of the prayer, is, in ef-feet, included in every judgment of death. If the mere prayer must arrest judgment here, because the question whether it should be granted was never before the Circuit Court, then in no case of felony within the benefit, should judgment have ever beeu awarded in the Court of Appeals, and then in every case of capital felony, it is at the option of the prisoner whose appeal has failed, whether he will receive sentence here, or stop the proceeding of this court by ioterpo-sing a claim, which, however unfounded, it cannot decide upon. If a question of the prisoner’s identity, of insanity, of pregnancy, or of other matter of fact requiring trial by jury, should seriously arise in this court, it might become necessary to refer it to the Circuit Court. But where the award or judgment involves only questions of law, it follows the dismissal of an appeal as a legal consequence, and the hearing of the motion for it, or the proceeding to it without formal motion, is no more the exercise of original jurisdiction, than is the remanding of a prisoner for another trial after granting his motion in arrest of judgment, or the making of any other order rendered necessary by the decision had upon an appeal.
The circumstance that the appeal has been abandoned, does not take this case out of the settled usage, which has been established in cases where the appeal is dismissed. An appeal abandoned, is only an appeal dismissed by consent of the appellant. The caséis in just the same situation, whether the dismissal results in one way or in another, whether it is solemnly argued and long considered, or the brief is submitted and an adverse opinion immediately pronounced, or the case is struck off the docket in defauh of prosecution, or the assent of the appellant is expressed by abandonment. No matter what the course of proceeding, after dismissal the questions submitted by a motion for a new trial have been decided, and motion for sentence and prayer of clergy must be matters which could not have been presented on the circuit, more thau in the case before us. A notice of appeal arrests the judgment; it is the right of the appellee to docket any case for dismissal, if the appellant should not docket it; the report of the Circuit Judge, consequent upon this notice, is made for this court; and whether in the hands of the elerk, or of the appellant’s attorney, is entrusted to an officer-of court to be properly used, according to the purpose for which it was designed ; this report, (or in default of it, a copy *396 0f the indictment and verdict, with information to be derived from the Circuit Judge,) gives to the court sufficient 'understanding of the case. Under these circumstances, abandoning an appeal takes from this court no power which the prosecution of it could have justified. No jurisdiction can arise to the court from the appellant’s submission to it of points of law, or from any consent given by him. In every case, the authority of the court is that, not of an arbitrator, but of a judge, depending not on the election of a party, but on the appointment of law. Terms imposed upon the grant of a motion, differ altogether from a condition, that power, not otherwise justifiable, shall be submitted to if the motion be denied; which condition must be supposed to be imposed upon a prisoner when his appeal is heard, and to justify irregular assumption of power, if from the hearing be derived a power to pass sentence, that does not exist when the appeal is abandoned.
To hold that by abandoning his appeal, after he has arrested the proceeding of the Circuit Court by notice of appeal, a prisoner found guilty of felony, can postpone judgment until the Circuit Court may award it, would enable him to postpone it to an extent that would be scandalous to the administration of justice. At the next Circuit Court after abandonment of the motion for new trial, notice of appeal might be again interposed as to some question concerning beuefit of clergy, or some new ground suggested for arresting judgment; that again might be abandoned, and so on, as long as ingenuity could furnish the pretence of a question requiring the decision of the Circuit Court.'
The Couit then is of opinion that the prisoner was properly put to the bar here for judgment. So far as his acknow-ledgement and submission could avail, the abandonment of his appeal has shewn that he has been properly found guilty of the felony of which he was charged, and that the charge was made in due form by the indictment.
II. Is the prisoner entilled»to the benefit of clergy 1 By the common law, clergy is demandable for any felony. Its denial must be grounded on some statute, and the indictment and evidence must expressly bring the case within the words of the statute. When it has been taken by statute from an offence which is felony at common law, the indictment need not conclude cóntra form,am statuti. If the words of the indictment are tantamount in sense, and differ .only in the form of expression from those used in the statute, the indictment is sufficient. It would be sufficient, if the of-fence were cont. form. stat. So there is no difference between the strictness necessary in describing a common law offence to bring it within the prohibition, and that necessary in describing a common law offence, from which benefit of clergy *397 has been taken, to bring it within the denial. The Court must always be able, by inspection of the indictment and the verdict, to see the case to which, in awarding judgment, it must apply the law ; and it must see clearly, before it can be justified in declaring that the case is one in which the law has denied the benefit to which all felons are prima, facie entitled, and demands the solemn doom of death to be pronounced.
The Statutes 23 Hen. 8, c. 1; 25 Hen. 8, c. 3; and 4 and 5 P. & M. c. 4, are all of force here ; that of 1 Ed. 6, c. 12, never was. So that the question so much discussed in Coulter's case, and the commentaries thereon, does not at all arise in the case before us. There is no doubt here that the benefit of clergy has, by statute, been taken from the malicious wilful burning of any dwelling house, or barn, then having corn or grain in it, belonging to another person. As to crimes of burning, besides the statutes above mentioned, we have of force the Statute 37 H. 8, c. 6, against burning of frames, and the Statute 22 and 23 Ch. 2, c. 7, against the burning of any stack, house, building, or kiln, maliciously in the night time ; but not the Stat. Geo. 1, c. 22, (commonly called the Act,) which, amongst other acts of malicious mischief made capital, includes the setting fire to any house, barn, out-house, wood, stáck, &c. nor any similar statute.
It has been argued in this case, that long ago it was settled, and ever since has been held, that in an indictment for felonious arson, the word house, without dwelling, is sufficient ; that to constitute the crime at common law, the burning must be of a dwelling house or parcel thereof, (except the case of a barn, for which there must be special allegations and circumstances ;) and that by a verdict finding the prisoner guilty of the felony charged in this indictment, the Court is informed that his guilt of burning a dwelling house has been established ; for that it must be presumed that proper instructions were given to the jury, and that under those instructions, the evidence was found to show that the burning was of an inhabited building, or of some of the buildings which are parcel of a dwelling house — all of those buildings, and nothing else, being included in the term house, just as they are in the term dioelling house.
Lord C. J. Coke says, “Note a diversity between the indictment of burglary and burning; for the indictment of burglary must say domum mansionalem, but so need not the indictment of burning, but domum, viz: a barn, &c. malt-house, or the like.” The videlicit and the &c. under it, here make some confusion ; but the intention seems to be, to declare that the word domum, in the indictment, is alone sufficient, whether the burning was of the inhabited house, or of any of those ottisei-buildings, which (as had before been said) were, *398 as well as the ball, parlor, lodging chambers, and other in-se£ edifices, included in the mansion-house. Thus it is understood by Hale, Hawkins, and the later writers on criminal law. If then domus has, since indictments were written in English, been correctly translated house, an indictment using house, sufficiently charges a ielony, without the term dwelling house, and judgment could not be arrested for its insufficiency. Such an indictment is, then, different from one that should omit maliciously, or some necessary ingredient of the crime ; and it will not do to say that such an omission as this might be supplied by sufficient evidence, and after verdict, must be presumed to have been supplied, just as well as dxoelling house must be presumed to have been proved under the allegation of house and proper instructions. The law which the writers, that have followed Coke, understood to have been laid down by him, is, that domus, in an indictment for burning, is, at common law, tantamount to domus man-sionalis.
It must be observed, however, that on the same page Lord Coke shows that he understands crematio domorum, used m the year-book 3 H. 7, 10, to mean burning of houses of any kind; that although he, m treating of burglary, was careful to use the words edifices and buildings, in reference to the inset and outset parcels of the mansion-house, yet, in the chapter on burning, he speaks of the inset and outset houses ; and that all the precedents which we have of indictments in English that contain only the word house, were framed after the Black Act passed, and by introduction of its phrase, set fire to, shew that they were framed under it, and with a view to the liberty of proving any house, which liberty its terms might be supposed to admit.
Lord Coke does not expressly say that an indictment with domus only, is sufficient as well to oust the benefit of clergy, as to establish a common law felony; but he had just before adverted to the statutes which took away the benefit from the burning of a dwelling house, or barn, with corn in it, and in sanctioning the omission of mansionalis in the indictment, he cannot easily be supposed to have intended an exclusion, from his general remark, of the most important cases under the head he was treating of. In the report of Poulter’s case the indictment is not given, but from expressions there found, the conclusion seems just, that only domus was used, and that that case, which was greatly considered, was one in which, under such 'an indictment, judgment of death was pronounced and -executed long before the Black Act was passed. It must have been held before the time of Lord Coke, by positive adjudications, (which seem to have been, known to him, although his references do not point them out) that the term dwelling house, used in the Statutes of H. -8, *399 and P. & M. was well expressed in an indictment for burning by the word domus ; although the same word would not serve the same purpose in an indictment for burglary. It is for us to say whether, now that the indictment and statutes are in the same language, the term house signifies exactly the same as dwelling house. By establishing that the burning of a house is felony at common law, we are authorized to give judgment in the case before ns; but to give judgment of death, we must be clearly satisfied, not only that house embraces dwelling house, but that it embraces nothing else besides the very thing that the statutes designed to express by dwelling house. We can take nothing by intendment, as was long ago said by the Judges, in holding that a full description of the offence of rape could not dispense with the word rapient, used by the statute of West. 2.
If there can be, by common law, no felonious burning of a house, which is not a dwelling house, then, perhaps, from the indictment and verdict here, a necessary inference arises that the prisoner has been found guilty, of burning a dwelling house; although, even then, the inference would not be stronger than that held insufficient, when an indictment, charging that the defendant “ voluntarily, feloniously, and of his malice aforethought, slew” the deceased, could not avail, because the word murdravit, used in the statute, was not introduced.
It is not easy to ascertain how the felony of wilful burning was, by the common law, limited and defined. Arson, by modern writers, is usually said to be an offence against the habitation, considered especially malignant and pernicious, because of the terror, confusion and risk of life attending it, and because of the entire destruction of property which it occasions, and the immense desolation to which this may extend. So far, however, as either the motive of the offender, or the terrific and destructive consequences of his act, may be regarded, the burning of a building, not parcel of a mansion, may be, in some instances, an' offence of greater enormity, than in others would be the burning of some edifice connected with a dwelling. As some precise rule seems, however, to have been thought necessary, which would exclude acts not worse in motive or consequences than ordinary trespasses, and would include the usual cases of deep malignity and great devastation, it has been laid down that to render the burning of a house felonious, it must appear to have been parcel of a mansion. “Not only the bare dwelling house, but all out houses that are parcel thereof, though not contiguous thereto, nor under the same roof, as barns and stables, may be the subject of arson.” “ If a barn, stable, or warehouse, be parcel of the mansion house, and within the same common fence, though not under the same roof or contiguous, *400 a burglary may be committed therein.” Thus, the descrip-t¡on 0f house which may be the subject of arson is precisely the same as that of the house in which burglary may be committed, except that, in the latter, the curtilage, home-stall, or common fence; is introduced. Its omission in the former probably arose from what is often observed by writers, that nicety as to the subjects of arson is, in England, rendered unnecessary by the Black Act and subsequent statutes. Reference is continually made to the head of burglary for cases decisive as to arson ; and if, in the latter, the mansion is extended beyond the curtilage, contiguity is indefinite, and we shall find no limit short of any edifice that is in any way used by an inhabitant of a neighboring dwelling.
But agreeing, as the writers on criminal law do, in the general explanation of what is meant by house, in the definition given of arson, the malicious and wilful burning of the house of another, they all concur also, that by common law, the burning of a bam filled with corn or hay, though not parcel of a dwelling house, was felony; and that so also was the burning of a stack of corn. Lord Coke, in his chap2 011 burning houses, to which subsequent writers refer for authority, declares the burning of a barn, not having corn or hay in it, nor being parcel óf a mansion-house, not to be felony, and says, “ the offender is not ousted of his clergy, but when he burns some part of a mansion, or a barn with corn but does not expressly say that by the law, as it then stood, the felony of burning was confined to the mansion and its parcels, a barn with corn or hay, and a stack of corn. On the contrary, he shows by reference to ancient authors, that the common law felony exlended to the burning. In 2 Inst. 188, in his exposition of the Statute West. 1, c. 15, he the same authors, and says, “burning of bouses, <fcc. felony by the common law, as appeareth by this Act, and our ancient authors.” The Act, which is said to be a rehearsal of the common law, amongst offenders not entitled t0 bail, enumerates those taken pur arson (burning generally) feloniously done; and it is burning without distinction, that Qianville classes amongst crimes punished capitally, or with l°ss °f member. The expressions used by some of the ancient authors cited, are ambiguous, as crematio domorum in the year book, alienus adas in Fleta, tectorum excesionis et incendia * in the translation of the laws of the Canute. Bracton speaks only of grain and mansions, but the Mirror comprehends in the felony, all burning of houses or goods, *401 done in the time of peace, feloniously, for mischief or revenge. By the ancient common law, house burning seems to have, been considered a species of hostile aggression, and was punished as crimen laesae magistrates. A Statute 8 H. 6, c. 16, declared1 it under some special circumstances of aggravation, high treason, and this statute, because of retrospective operation, was held to be only in affirmance of the common Even before the Statutes of H. 8, the year book 11 H. 7, 1, shews that one was indicted for that he had feloniously by night, burnt a barn, and because it wa» adjoining a mansion, this was held felony by the common law, and he was hung. It is impossible now to say when the ancient law on the subject assumed the form in which modern writers understand it to be presented by Lord Coke; or what influence statutes which never were of force here, may have had in moulding it to that form. A case in Plowden, cited in 3 Inst, shews nothing material; and Breham’s case, like the case Lovel v. Hawthorn, decides only that the words “ he burnt my barn,” were not actionable, because a barn filled with corn or hay could not be intended under the construction then adopted in slander of words in mitiori sensu, a construction which would have equally rendered the words harmless, because they did not necessarily impute a malicious burning. These cases, however, even more strongly than a single express decision in point, shew the undoubting sense of the. learned, in the time of Q,ueen Elizabeth, that the burning of an empty barn, not parcel of a mansion, was not felony; and confirmed, as they have been, by the concurrence of subsequent commentators, may well be opposed to any deductions now to be drawn from the writings of ancient authors. And yet, if no distinction between an empty barn, and any other building not parcel of a mansion, can, be supposed to have grown out of the special notice taken, both by the common law and the statutes, of a barn with certain articles in it, and if we look to the law of burglary for explanation of what shall be considered a parcel of the mansion, it is'hard, in this country of large farms and wide spaces, to adopt law which would confine felonious arson to the buildings within the curti-lage, and a barn outside, having therein com, grain or hay. It is not burglary, if the house entered be a vacant chamber in a building, of which other chambers are in the occupation of a tenant under lease; or if the house be a centre building unoccupied, though the wings are dwelling houses, setting fire to such unoccupied parts of a building, would fall under the Black Act; but that the partial destruction of those parts only, by malicious burning, would not have been felony at common law, has not been resolved. These and similar questions have been excluded from con *402 sideration in England by statutory provisions. Our law is strangely insufficient, if every building which it would not burglary to enter, may be burnt without dread of the punishments which await felony. And it would be as strangely inconsistent, if, when the Statute 37 H. 8, ¿nade of force here, punishes capitally the burning of any frame of timben' prepared towards the making of any house, the burning of a house erected and once inhabited, but at the time of the offence unoccupied, should not be felonious. On the other hand, the inconsistency is not much, less, when the burning of the frame is capital, and the burning of the unoccupied house only a felony within benefit of clergy ; and the Statutes 23 & 25 H. 8, would hardly be held, under the term dwelling house, to take benefit of clergy from the burning of an unoccupied house.
It has been argued, that even if the burning of any building in use, was a felony at common law, a building not parcel of a mansion, must be described in the’indictment by its peculiar designation, as a malt house, cotton house, and the like, and, therefore, that house, as used in this indictment, can¡ a^ter verdict, mean only dwelling house. There are English cases which hold house to be equivalent to mansion house, but those cases arose under the Statute of Geo. 1, which has the words, any house, accompanied by others that confine the signification of house, there used, to a building inhabited, or designed for the habitation of man. If, in the passage before quoted from 3 Inst. Lord Coke, by the <fcc. following barn, intended to mean (as from the preceding matter may be plausibly maintained) having corn in it, filled with hay, or the like, according to the circumstances to be shewn by proof, then he appears to have considered domus alone, sufficient in all cases, whether the building burnt was parcel of the mansion, or was a barn, not parcel of the mansion, but having such contents that the burning of it was felony. In Susannah Mintin's case, however, whilst the ^tat‘ ^ ®eo- was t0 ^ave done awuy all distinctions between full barns and empty ones, and between day time and night time, it seemed to be the opinion of all the Judges that, supposing it to lie necessary that there should be hay or corn in the barn, it must have been so stated, and no proof -would supply the want of such statement. The inference seems fair that, if the burning of a gin house or other building, not parcel of a mansion, is felony at common law, then that law considers such a building to be a house, and the felony is sufficiently charged by an indictment which uses either house only, or house, to wita gin house, or the like; but that to oust the benefit of clergy, the indictment must shew that the burning 'was of one of those houses which the Statute denying clergy particularly mentions.
*403 The appropriate meaning of house may be, the abode of man, but its more general sense, as a covering or place of( shelter, is too -common to be altogether disregarded. Why'' was dwelling prefixed to house, in the Statutes of Henry 8, if house alone would have expressed the same meaning 1
It has been suggested, that the specification was intended to distinguish between the actual apartments of abode, and out houses, such as dove-cotes, dog kennels, and cow houses, which, although within the curtilage, may often be destroyed by fire, without injury to the dwelling. For destruction of these, the higher penalty provided for security of the habitation may have been, thought no more proper, than for the destruction of other more valuable buildings which are left with less protection, if the felony of arson extends only to the dwelling house, and buildings parcel thereof. A design to burn such out houses, may not always contemplate injury to the dwelling. Even where it may have done so, the accidental extinguishment of the fire before the dwelling was reached, may well make a difference in punishment, in like manner as a murderous battery is punished-less than a murder, and in many other instances, a diversity in uncontrollable consequences widely separates acts which are similar in guilty intent.
It has been again suggested, that the. purpose was to distinguish the burning of any parcel of a dwelling, from that of any other house — all being included in the common law felony; or, at any rate, the burning of any parcel of a mansion actually inhabited, from the burning of a house not inhabited ; — the common law felony embracing all houses intended for the habitation of man.
This Court designs to do no more than decide the question before it. The observations which have been made, are intended only to shew what doubts rest upon this question. We cannot feel, in construing the Statutes of Henry 8, that influence of the Statute of H. 6, (never of force here) and decisions under it, which may have affected opinions before the time of Lord Coke. We are not relieved by decisions made concerning the sufficiency of domus, when indictments were m latin, or concerning the sufficiency of house, under the Statute 9 Geo. 1, from placing the words of this indictment, and those of the statutes which deny clergy, together, and inquiring whether they are the same, or clearly equivalent. Having no guide but the common- law and the statutes of Henry 8, we cannot perceive, with that certainty which must be attained before the life of a fellow creature be taken, that the offence described in this indictment is included in the denial of clergy made by those statutes.
The prayer for benefit of clergy is then allowed, and the sentence for felony within the benefit will now be pronounced.
*404 As that has been, by our statutes, made fine and imprison1" ment, the case of the prisoner is just as if he had been in-dieted and convicted of a misdemeanor, except that under the right of challenge, he has enjoyed privileges which one accused of a midemeanor is not entitled to, and that for a second offence, he may hereafter lose the benefit now allowed to him.
Nichaedson, Evans and Frost, JJ. concurred.
Withers, J. absent, from indisposition.
The prayer for benefit of clergy was allowed, and the sentence for felony within the benefit was pronounced by the court.
O’Neall, J.
In this case, I differ 'from the Court on the question of jurisdiction, and hence, it is my duty to give the reasons for that opinion. It is proper to state, as preparatory thereto, that although the prisoner gave notice of an appeal, he abandoned it, and made no motion in this Court. It is true the case was docketed, but the prisoner’s counsel was in possession of the report of the Judge below, and if he had not, at the request of the presiding Judge here, placed it in his possession, there would not have been any thing of the case in this court.
I agree, that where a prisoner proseciites an appeal, he brings up the whole case, and, in such a case, on dismissing the appeal, it is our duty to render the final judgment, which the court below would have done, if the case had not been removed by appeal. This has been the practice, uniform and settled, from the earliest days of our jurisprudence, and having often concurred in its exercise, I shall be the last to question it. But the case before us, stands on entirely different grounds. The motion of the Attorney General for sentence, is an original motion. There is nothing which makes it the consequence of any judgment which we are to render. It is in vain to say, that an appeal, not prosecuted, is the same as a motion dismissed by the Court. It is simply a letting fall of all proceedings by way of appeal, and the consequence is, that the judgment below remains undisturbed, 'and must be there enforced. For there is the record — and here it cannot regularly be, only when, as a consequence of the appeal prosecuted and dismissed, the duly is devolved on this Court of pronouncing the sentence-.
No doubt the Court of-Appeals, called the Constitutional Court, grew out of the conference of the Judges, on points reserved before the Constitution was adopted. By the Constitution, the Judges were to meet first ai the close of their circuit, and, by the amendment of 1816, at such times and places as the Legislature, from time to time, should direct, to hear all motions for new trial, in arrest of judgment, and *405 such points of law as might be submitted to them. This clearly gave appellate, and no other jurisdiction, and so it has been always understood. For the submission of even a mere dry point of law, unconnected with an appeal case, has never been tolerated. The Act of 1824, which broke up the Courts of Appeal in Law and Equity, and established a separate Court, in its first section declares that the Court thus established shall exercise “ appellate jurisdiction.” The Act of 1835, which terminated that Court, established the Court of Appeals, consisting of ten Judges of Law and Equity, and clothed them with the power of hearing and determining all motions which may be made for new trial, in arrest of judgment, and such points of Law and Equity as may be submitted to them, with the same powers now exercised by the Court of Appeals. That court experienced an earlier death than any of its predecessors. For, in the next year it was abolished, and this Court established in the following words, “ That all appeals from the Courts of Law shall be heard and determined in a Court of Appeals con-sistingof the Law Judges.”
After this review, it seems to me plain, that the authority which this Court possesses, is appellate merely; and if the case be not here as an appeal, we have nothing to do with it. All appeals from the Courts of Law are to be heard by us. From what court does the appeal come before us, as to what sentence shall be passed on the prisoner? "What court has decided, that he is or is not entitled to clergy? The answer must be to each of these questions, no court has passed upon the matter. It seems to me that this ousts our jurisdiction. I suppose it would not be pretended that, if the Circuit Court was now in session, and the appeal abandoned, (as it is) the sentence could not be there passed; for, in such a case, the letting fall the appeal would leave the prisoner amenable to the judgment of the court which tried him. That, it seems to me, is the case now. But, it is said, it would present so many inconveniences in practice, that it could not be tolerated. If that were so, still I do not perceive how we could have jurisdiction. Certainly, mere inconvenience never clothed any court with a power which the law of its organization did not give. I think, however, the inconvenience is altogether in fancy. Take this case; the prisoner is remanded to the circuit for sentence. The Judge, on bringing him up for sentence, hears his prayer for clergy, and disallows it — he appeals; or the Judge allows it — and the Solicitor appeals — in either case, the appeal brings him and the sentence here, the Court hears the argument, affirms or reverses the judgment below, and pronounces the sentence which the Judge below should have pronounced. This is a very short delay. It preserves uniformity, and keeps the Court in its proper character of an appellate tribunal.
*406 As, however, a majority of the court think they can hear the motion for sentence, the prayer for clergy, and according to the result, sentence the prisoner, and thus end the matter, I have no objection to state my views on the prisoner’s,prayer for clergy.
That the offence charged, “ the burning of a house,” is a clergyable felony, is, I think, perfectly clear. At common law, the burning of any house was (as I think) a felony. In Fleta, it is said, “ Si quis aides alíenos, nequitor, oi imnvici-tiani, vel praeda catisa, tempore pads, combusuit, et hide convictas pruditper apellum, vel sine, capitali debut senten-tia purvire.” (Selden’s Fleta, book 1st. chap. 37, p. 54.) This sentence, translated into 'English, is, “if any one wickedly, for enmity, or on account of spoil, shall have burned another’s houses, and has been thence convicted, either by appeal or without, he ought to be punished by a capital sentence.” This is a clear description of a common law felony. It is observable that, in it, the character of the houses burned does not seem to be regarded.
In his Institutes, Lord Coke tells us, “ burning is a felony by the common law, committed by any that maliciously and voluntarily, in the night or day, burneth the house of another.” At D, he tells us what is “ the house of another.” “ This is,” he says, “ not only intended of inset houses, parcel of the mansion house, but to the outset also, as barn, stable, cow house, sheep, house, dairy house, mill house, and the like, parcel of the mansion house;, but burning a barn, being no parcel of a mansion house, is no felony ;■ yet if there be corn or hay within, the burning thereof is felony, though-the barn be not parcel of a mansion house. But the offender is not ousted of his clergy but where he burned some part of a mansion house, or a barn with corn.” This authority is clear, that the burning of houses, other than the dwelling house proper, is felony. Indeed, I think, all which are part and parcel, the usual incidents of a dwelling house, and near enough to it to put it in danger if they be burned, are to be regarded as included under the general term, dwelling house, used in the Statutes hereafter to be noticed. All the reasons apply to such houses as well as the dwelling. The same danger to life, the same invasion of the security of home and its comforts, are to be found in the one as well as the other.
Whether that be so or not, is, perhaps, not important now to inquire. Nor is it of any consequence whether the burning of an empty barn, not parcel of the mansion house, be or not felony. It is, beyond all doubt, a criminal offence, ranking as a felony or as a misdemeanor, to burn the house of another, and since the Act making fine and imprisonment the punishment of a clergyable felony,, there is no difference- *407 between such an offence and a misdemeanor, unless it be as to the cousequences of a second oflence.
If the burning of any other house than a dwelling house, is an offence punishable at common law, (whether the crime be a felony or misdemeanor) it is clear that the indictment, to oust the • prisoner of his clergy, must distinguish between them. For the charge of burning a house would not, ex vi termini, mean a dwelling house, from which clergy is taken away, by the Stats. 23d H. 8, c. 1, §3 — 25 H. 8, c. 3, §3, — 4 & 5 P. & M. c. 4. If might mean the lesser offence. As I understand Criminal Pleading, the offence must be so charged, that the court will know what judgment to give, without resorting to any thing extrinsic of the indictment. The Status of 23 H. 8, c. 1, § 3 — under which we are to pass — uses the words “ d welling house,” — any one convicted of burning adwelling house is deprived of his clergy. TheStat. 25 H. 8 c. 3, § 3, which undertook to extend the Statute 23d H. 8, c. 1, § 3, to persons standing mute, &c. used the word house, in its enacting clause, although in the proem it had used the ■word “ dwelling house.” Taking the two together, I suppose they would receive the same construction, that is, that clergy was taken away from the burning of a dwelling house; ■md this certainly becomes more plain, when the Stat. 4 & 5 P. & M. c. 4, is referred to, which takes away clergy from accessories before the fact, in burning a dwelling house.
If there be a doubt whether clergy be taken away from the Dffence charged, the duty of the Court is, to give the criminal the benefit of that doubt. The word dwelling house, is now of a certain and definite meaning. It means the habitation of human beings, where they gather themselves together to converse, to rest, to shelter, to eat, and to sleep. The wants of man have given him many other houses, not necessarily parcel of his dwelling, such as his cotton house, his work shop, his store house, his lumber house, &c. It cannot be that the term house, which covers all these, as well as a dwelling house, is definite enough to exclude clergy. Nor will it do to say, the evidence must give it the character and sense of a dwelling house. For if that were so, it would be constantly subject to a meaning to be obtained outside of the record. I am, therefore, satisfied that the piisoner is entitled to his clergy, and the Court having decided that the case is properly here, I have no doubt the court can give the judgment which the Court below, under similar circumstances, have given.
(The State v. Kitchens, 2 Hill, 612; The State v. Addington, 2 Bail. 516; The State v. Duestoe, 1 Bay, 377.)

 Note. A later translation is “ irruptio in dommm et incendi-wnP The original Saxon “ hus-brec and boernet,” seem naturally to be rendered house breaking and burning. Hus, house, is by philologists derived from a root which means to cover.